UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA DYGERT,

                   Plaintiff,                        Civil Action No. 13-11317

         v.                              District Judge Patrick J. Duggan
                                             Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                   Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]**

From many years, Plaintiff Linda Dygert worked as a church custodian. (*See* Dkt. 6, Administrative Transcript ("Tr.") 53.) In December 2008, Dygert, then age 46, underwent surgery on her right shoulder. (Tr. 138, 195-96.) Dygert did return to work briefly following this surgery, but, in July 2009, right-shoulder problems led to a second surgery. (Tr. 54-55, 170.) During that time, her church eliminated her position and Dygert has not worked since. (Tr. 55.) Dygert maintains that since her first surgery, her right-shoulder problems have prevented her from working. As such, she applied for Social Security disability insurance benefits. An administrative law judge acting on behalf of Defendant Acting Commissioner of Social Security concluded that Dygert was not under a "disability" as that term is used in the Social Security Act. Dygert appeals that finding to this Court.

In particular, Dygert says that the ALJ erred in discounting her allegations of her functional

limitations, and, as such, she cannot perform the jobs that the ALJ believed she could. For the reasons set forth below, this Court finds that Dygert has not shown that the ALJ's decision to discount her testimony lacked substantial evidentiary support. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 10) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Medical Evidence

In 2008, Dygert treated with several physicians associated with the University of Michigan Health System, including Dr. Margaret Riley and, most often, Dr. Tarannum Master-Hunter. (*See* Tr. 217; *see also* Tr. 202-21.) In September 2008, Dr. Riley noted that Dygert's past medical history included "depression and anxiety, fibromyalgia, traumatic brain injury and subsequent headaches, hypertension and hyperlipidemia" and that Dygert had been "having difficulty with hand pain[.]" (Tr. 206.) Dygert explained that she was still having significant hand pain following her recent carpal-tunnel release surgery. (*Id.*) Dr. Riley prescribed Naprosyn for pain and Sertraline for anxiety and depression. (Tr. 207.)

That month, September 2008, Dygert began seeing Dr. Paul Kenyon, an orthopedic surgeon who would continue to treat Dygert until May 2009. (Tr. 236.) Regarding Dygert's right-hand stiffness, Dr. Kenyon wrote, "She has a decent grip. I think she just has adhesions. Her x-rays really don[']t show much and her history is negative for any rheumatoid disease. I think what she needs at this point is physical therapy. No surgery is required at this time." (Tr. 236.)

In October 2008, Dygert saw Dr. Kenyon "for a new problem[.]" (Tr. 234.) Dygert had been

2

experiencing pain and popping in her right shoulder for about a month. (*Id.*) Dr. Kenyon noted that x-rays were negative, but he was "concerned" that Dygert had a torn rotator cuff. (*Id.*) He gave Dygert a shoulder injection and scheduled an MRI. (*Id.*)

Later in October, Dygert saw Dr. Master-Hunter for a follow-up of her depression; Dygert also reported that she had been recently struggling with hand, shoulder, and wrist pain. (Tr. 208.) Dr. Master-Hunter noted that Dygert was having difficulties getting her church to modify her job. (*Id.*) Dr. Master-Hunter explained, "She is actively looking for a new job. They did try and considered disability, but overall she just needs to change her job and is not necessarily desiring disability, but just a change in jobs [so] that she does not have to have so much discomfort and injuries. She is seen with Dr. [B.J.] Page." (*Id.*)

At her October 27, 2008 appointment with Dr. Kenyon, the physician noted that Dygert had received only temporary pain relief from the injection and that her MRI "show[ed] tendinosis and impingement." (Tr. 232.) Dr. Kenyon discussed surgery with Dygert; Dygert wished to proceed but wanted to first review her work schedule. (*Id.*)

In December 2008, Dr. B.J. Page at Chelsea Community Hospital authored a "To Whom It May Concern" letter. (Tr. 300.) Dr. Page explained,

> I have been treating Linda Dygert for several years now. Her primary problem has been problems associated with the upper extremities, particularly her hands and wrists. Although it is my understanding that this patient does have a history of arthritis, she also has a history of a hand-intensive job.
>
> I believe that her hand-intensive job (custodian at a church) has significantly contributed to her overuse syndrome and cumulative trauma syndrome that has perpetuated inflammation and aggravated her arthritis, tendinitis, neuritis, and inflammation of the upper extremities.

(Tr. 300.)

On December 11, 2008, Dygert underwent shoulder surgery. (Tr. 195-99.) Dr. Kenyon performed a right shoulder acromioplasty, coracoacromial ligament resection, subacromial bursectomy and rotator cuff repair; arthroscopy with intra-articular debridement; and distal clavicle resection. (Tr. 195.) Following her surgery, and until July 2009, Dygert participated in physical therapy to strengthen her surgically-repaired shoulder. (Tr. 259-87, 323-25.) In January 2009, Dr. Kenyon wrote, "[s]he has about one half of her motion. She does custodial work so she can only do a one-handed job. Continue [physical] therapy and I will reassess her in 4 weeks." (Tr. 228.)

In February 2009, Dygert told Dr. Kenyon that her shoulder was doing better. (Tr. 226.) Dr. Kenyon noted, "She has about half of her motion actively but passively is full. She is to continue therapy and do home stretches." (*Id.*)

In March 2009, Dr. Kenyon performed an evaluation of Dygert's shoulders which included range of motion and strength tests. (Tr. 224-25.)  Dr. Kenyon provided this summary:

> [Ms. Dygert] continues to improve and her motion is good. Her strength is nearly normal. She doesn't feel she is ready to go back to work yet with all the mopping and reaching that she has to do. I'm going to have her take a couple of Motrin a day with food which she has tolerated in the past and also continue physical therapy. Hopefully in 6 weeks she'll be able to get back to her regular job.

(Tr. 224.)

In May 2009, Dygert told Dr. Kenyon that she had noticed a painful pop in her shoulder. (Tr. 222.) Dr. Kenyon performed another shoulder evaluation. (Tr. 222-23.) He reasoned, "[s]he has good motion and strength but she does have some crepitation and it is clearly bursitis forming between her rotator cuff, overlying deltoid muscle and her acromion." (Tr. 222.) Dr. Kenyon continued, "At this point, we're going to start her on Mobic once a day however really push using

it. We will go back to work next week with restrictions. Hopefully with use of an anti-inflammatory this bursitis will resolve." (Tr. 222.) It appears that this was Dygert's last visit with Dr. Kenyon.

Dygert went back to work in May 2009 and continued to work for about a month. (Tr. 54-55, 170.) Dygert would later testify that "with all the weight that I did work with at my job, it eventually ended up hurting the shoulder again and they took me back out of work and did some testing and seen that it had actually torn again." (Tr. 55.)

In May 2009, Dygert began to see Dr. Mark Pinto (who, like Dr. Page, also worked at Chelsea Community Hospital). (*See* Tr. 337.) Upon an evaluation of Dygert's shoulders, Dr. Pinto opined, "[s]he does have obvious crepitus [cracking or popping] through her range of motion on the right, which is easily palpated [on the] right in comparison to the left." (Tr. 337.) Dr. Pinto ordered an MRI arthrogram to evaluate Dygert's rotator cuff. (Tr. 338.)

In June 2009, Dr. Pinto reviewed the MRI arthrogram. (Tr. 335-36.) Dr. Pinto noted that neither he nor the radiologist observed a rotator cuff tear; however, there were "[s]ome complex findings within subacromial space either consistent with significant bursitis versus some scar tissue." (Tr. 335.) Dr. Pinto had a "long discussion" with Dygert: "In light of her symptoms and the finding on the MRI, I have recommended a further trial of conservative care." (*Id.*) Dr. Pinto provided an injection and wanted Dygert to continue physical therapy. (*Id.*) Dr. Pinto also completed an "Employment Status Update": Dygert's prognosis was "good" but she was under partial disability for the next six weeks. (Tr. 291.) In particular, Dygert was not to engage in pushing, pulling, lifting, or carrying greater than five pounds or "activity above chest height." (*Id.*)

In July 2009, Dygert saw Scott Thompson, a physician assistant who worked with Dr. Pinto. (Tr. 333-34.) Dygert reported that her pain continued to be at the five-out-of-ten level, but was

5

probably worsening. (Tr. 333.) Dygert said she was having pain at night, had clicking, popping, and

catching in her shoulder, and sometimes had difficultly raising her arm above her shoulder. (*Id.*)

Thompson's examination revealed "palpable crepitus" in Dygert's right shoulder in comparison to

her left shoulder. (*Id.*) After a long discussion with Dygert, Thompson concluded,

> She has failed conservative treatment course with icing, anti-
> inflammatory medicines and even a corticosteroid injection. She is
> requesting surgical intervention. Surgically I would recommend a
> diagnostic arthroscopy with a possible labral repair, possible rotator
> cuff repair, possible biceps tenodesis versus tenotomy.

(Tr. 333.)

On July 15, 2009, Dr. Pinto operated on Dygert's right shoulder: "diagnostic arthroscopy

with extensive glenohumeral debridement," "[r]evision subacromial decompression at the

acromioclavicular joint facet," and "[a]rthroscopic rotator cuff repair." (Tr. 303.)

At a September 2009 follow-up appointment with Thompson, Dygert reported that her pain

level was five out of ten. (Tr. 330.) Thompson provided that Dygert could stop using her post-

surgical sling, but was not to lift, push, or pull greater than five pounds, and was not to engage in

overhead activities. (*Id.*) Thompson enrolled Dygert in physical therapy and told her to continue

icing and taking anti-inflammatories. (*Id.*)

"[T]wo months and 28 days" post surgery, Dygert had another follow-up with Thompson.

(Tr. 328.) At this mid-October 2009 appointment, Dygert reported pain at "probably 4/10." (*Id.*)

"Unfortunately," noted Thompson, Dygert was having "problems with insurance and workman's

comp[ensation]" and could not "afford to perform physical therapy." (*Id.*) Dygert was doing a home

exercise program, however, and Thompson discussed the "importance of performing [the] home

exercise program to toleration." (Tr. 328.) Thompson "discuss[ed] a weight restriction of

6

approximately 5-10 pounds with no overhead activities." (*Id.*)

Dygert next saw Thompson in December 2009. (Tr. 327.) The physician assistant noted, "She continues to notice some mild improvement. She rates her pain level . . . as 1/10. She still continues to perform her home exercise program on her own. . . . She still reports some gains but is somewhat frustrated at the slow process." (*Id.*) Thompson restricted Dygert as follows: "no lifting, pushing, or pulling greater than 5 pounds, and no overhead activities if this can be accommodated at work." (Tr. 327.) Dr. Pinto provided an "Employment Status Update" with these restrictions. (Tr. 370.)

Six months after the July 2009 shoulder surgery, Thompson noted that Dygert was "doing very well." (Tr. 326.) "She reports continued improvement. She rates [her] pain level today [at] approximately 2/10, worse with stretching activities. She continues to perform independent home exercise program. She continues to report increased range of motion, increased strength." (*Id.*) Thompson altered Dygert's work limitations: "No lifting, pushing or pulling greater than ten pounds. No overhead activities." (*Id.*) Dr. Pinto's same-day "Employment Status Update" echoed Thompson's limitations except that he provided "[n]o activity above chest height." (Tr. 363.)

Dygert next saw Thompson in March 2010. (Tr. 397-98.) He noted that Dygert was "doing very well." (Tr. 397.) Dygert, however, reported pain at the four-out-of-ten level and that her pain "occasionally [woke] her up at night." (*Id.*) Thompson provided Dygert a prescription for physical therapy in the event that she could secure financial assistance for that treatment; he also prescribed Naprosyn. (*Id.*)

Also in March 2010, Dr. Bharti Sachdev evaluated Dygert for Michigan's Disability Determination Service, a state agency that helps the Social Security Administration evaluate

7

claimants. (Tr. 380-82.) Dygert reported three primary ailments: pain in her right shoulder and right-side of her neck, aching pain and numbness in all fingers, and worsening depression. (Tr. 380.) Regarding her right shoulder, Dygert said that it hurt on a daily basis, usually at the three- or four-out-of-ten level, and that neither Aleve nor Naprosyn helped. (*Id.*) As for her hands, Dygert explained that after carpal-tunnel-release surgeries, she developed trigger fingers in both hands and had finger release surgery. (*Id.*) Dr. Sachdev noted, "She states she still feels tiredness and aching in her fingers which become stiff and sore most of the day. They also can curl on an intermittent basis." (*Id.*) On exam, Dr. Sachdev found that Dygert's right shoulder had some tenderness but a normal range of motion. (Tr. 381.) Dygert was able to make a fist with both hands, her right hand strength was "4+/5," and her "gross and fine dexterity [was] pretty good." (Tr. 381.) Dr. Sachdev noted that Dygert was "very anxious." (Tr. 381.) The consulting physician concluded, "[Ms. Dygert's] current clinical examination shows a fairly good range of motion. However, she feels painful and weak in the right shoulder. She would benefit [from] physical therapy." (Tr. 382.) As to Dygert's hands: "Her right hand is somewhat weaker. Again, she would benefit [from] physical therapy. I think she was overusing her hands in the past and she needs a change in the working style or job description." (*Id.*)

Dygert returned to Thompson in May 2010. (Tr. 395.) She reported pain at the two-out-of-ten level. Thompson summarized,

> She has done quite well, despite the consideration of not being able to perform formal physical therapy. She is doing quite well as far as range of motion and strengthening. She is still concerned about some pain that she is experiencing with lifting activities. She is anxious to return to work activities. She states that, however, due to the pain in her shoulder, she does not feel that she could return to any heavy lifting work activities.

(Tr. 395.) Thompson reassured Dygert that she would continue to improve up to about a year post-surgery. (*Id.*) Thompson wanted Dygert to undergo a functional capacity exam: "This functional capacity examination will provide Dr. Pinto and myself with an independent and objective test of the patient's limitations as far as returning to work activities. This will give us an accurate assessment of where she lays with her work status and also in allowing her to return to activities." (*Id.*) Pending the evaluation, Thompson provided restrictions of "[n]o lifting, pushing, or pulling greater than 5-10 pounds. No overhead activities." (Tr. 396.)

The administrative record concludes with Dygert's October 2010 visit with Thompson. (Tr. 393-94.) Dygert told Thompson that she had one- to two-out-of-ten pain in her shoulder. (Tr. 393.) Thompson summarized Dygert's complaints: "She feels that the pain is affecting her quality of life. She notes pain in addition to weakness. She does not feel confident lifting anything overhead or anything heavy. This is her main complaint, now 1 year status post surgery." (*Id.*) Dygert informed Thompson that financial concerns had prevented her from undergoing the functional capacity exam. (*Id.*) Thompson's shoulder evaluation resulted in these findings:

> [F]orward flexion and abduction to approximately 106 degrees without pain. Shoulder range of motion external rotation 60 degrees and external rotation to T12, again with pain on range of motion. General strength testing shows 5/5 strength without pain with internal rotation; external, supraspinatus and biceps tension all with 4+/5 strength without pain. Impingement I and II are minimally positive. Drop-arm and empty can are negative.

(Tr. 393.) Thompson's impression was "[p]ersistent pain status post revision rotator cuff repair." (*Id.*) He wrote: "Dr. Pinto would like to have the patient proceed with a functional capacity exam. . . . I discussed with her that typically patient[]s see improvement up to 1 year status post surgery. She is frustrated at this point." (*Id.*) In contrast to prior visits, Thompson did not provide any

9

functional limitations. (Tr. 394.)

### B. Application for Benefits

In December 2009, Dygert applied for disability insurance benefits. (Tr. 19.) She alleged that she became unable to work on December 11, 2008—the date of her first shoulder surgery. (*Id.*) After Dygert's application was initially denied in July 2010, Dygert requested an administrative hearing. (*Id.*) On July 28, 2011, about a year after her second shoulder surgery, Dygert appeared before Administrative Law Judge Michael R. McGuire. (Tr. 48-67.)

### C. Testimony Before the ALJ

The ALJ inquired about what Dygert could still do with her right shoulder. The ALJ asked, "[I]f you had a job where you didn't need to lift more than 20 pounds and never more than 10 with your right upper extremity and you didn't have to do any work above shoulder height, you might be able to do that." (Tr. 57.) Dygert responded, "I might be able to. With things that I do around the house, I don't think I can do it for long periods of time." (*Id.*) Dygert provided an example of hanging clothes on a clothesline; she explained that after engaging in that activity for 30 to 45 minutes, her shoulder would hurt and swell. (Tr. 57.) Dygert stated that she could cook because that did not require "a lot of heavy lifting or anything," could vacuum with her left arm, and could drive for up to an hour. (Tr. 58-59.) In answering the ALJ's question about whether she could still quilt, Dygert answered, "Yup, I can do a lot of like things just for certain amount of time and I have to take a break." (Tr. 60.)

Dygert's counsel also inquired into Dygert's ability to function. (Tr. 60.) When he asked about sleeping at night, Dygert answered, "I do not sleep good. I wake up a lot." (Tr. 60.) The reason: "I can't get comfortable on the pillows. I have to have a lot of pillows propped up and my

10

shoulder hurts." (*Id.*) Counsel also asked whether Dygert took naps during the day; Dygert explained, "I do take a nap in the afternoon. Sometimes, I try to not do it but I give in and it's about 2:00, I feel sleepy or sore and I just need to lay down for a while." (Tr. 61.) Dygert said her naps lasted anywhere from "20 minutes to an hour and a half." (Tr. 62.) In following up on her remark to the ALJ about needing breaks from her activities, Dygert explained that her breaks would consist of reclining and icing her shoulder. (Tr. 61.)

A vocational expert was also present at Dygert's administrative hearing, and the ALJ asked the expert whether there would be jobs for a hypothetical individual with certain functional limitations. (Tr. 63.) In particular, the ALJ asked the expert to assume an individual of Dygert's age, education, and vocational background who could

> on occasion, lift or carry 20 pounds, frequently 10 [pounds,] but never more than 10 pounds with the right dominant upper extremity[;] who could stand, walk or sit for six hours in an eight hour day[;] [she] could push or pull 20 pounds but again, never more 10 with the right dominant upper extremity and who needs to avoid above shoulder height or reaching with the right upper extremity.

(Tr. 63.) The expert said there would be both "light" and "sedentary" "unskilled" positions that the hypothetical individual could perform. (Tr. 63.) In particular, label coder and panel maker at the light level, and document preparer and addresser at the sedentary level. (Tr. 64.)

**D. The ALJ's Decision**

Upon hearing Dygert testify and reviewing the administrative record, the ALJ applied a five-step framework to determine whether Dygert was under a "disability," i.e., whether she was unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §

11

404.1505 (DIB); 20 C.F.R. § 416.905 (SSI). In particular, the Social Security regulations provide

that disability is to be determined through the following sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520,

416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis

reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the

[Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

The ALJ deferred his ruling at step one, noting that while there was evidence of substantial

gainful activity after the alleged onset date of December 11, 2008, Dygert had explained that the

income was due to employer disability payments. (Tr. 21.) At step two, he found that Dygert had

the following severe impairments: "status post repair and then revision of repair of a right rotator

cuff tear." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination,

met or medically equaled a listed impairment. (Tr. 22.) Between steps three and four, the ALJ

determined that Dygert had the residual functional capacity to "perform limited light work as

defined in 20 CFR 404.1567(b)":

> The claimant is able to lift/carry or push/pull 20 lbs. occasionally and 10 lbs. frequently. In an 8-hour workday, she is able to stand/walk/sit 6 hours. The claimant is not able to lift/carry or push/pull more than 10 lbs. with her dominant right upper extremity. She is not able to perform above shoulder height reaching with her right upper extremity.

(Tr. 22.) At step four, the ALJ found that Dygert was unable to perform any past relevant work. (Tr. 24.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Dygert's age, education, work experience, and residual functional capacity. (Tr. 24.) The ALJ therefore concluded that Dygert was not under a "disability" as defined by the Social Security Act from the alleged onset date through the date of his decision, August 15, 2011. (Tr. 25.)

On January 24, 2013, the Social Security Administration's Appeals Council denied Dygert's request for further administrative review. (Tr. 1.) The ALJ's decision therefore became the final decision of the Commissioner of Social Security. Dygert appeals that decision here.

## II. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks

omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## III. ANALYSIS

Dygert raises a single claim of error. She says that the vocational expert's testimony is not substantial evidence supporting the ALJ's step-five finding that there were jobs available that she could perform. (*See* Pl.'s Mot. Summ. J. at 8.) In support of this claim, Dygert relies on her own testimony: she says that she testified to having greater limitations than that of the hypothetical individual the vocational expert considered. (*See* Pl.'s Mot. Summ. J. at 8-10.) Dygert's claim of

14

error, therefore, turns on whether substantial evidence supports the ALJ's decision to discount her

testimony. The Court believes that it does. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485,

488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle.");

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord

the ALJ's determinations of credibility great weight and deference particularly since the ALJ has

the opportunity, which [a court does] not, of observing a witness's demeanor while testifying").

Dygert first relies on her testimony about how she could use her right arm. (Pl.'s Mot. Summ.

J. at 9.) In particular, she cites the following testimony:

> [ALJ:] And you don't feel confident lifting anything over your head
> or anything heavy.
> [DYGERT:] Oh, no. Absolutely not.
> Q And can you define heavy for me?
> A A gallon of milk is heavy. I can lift a gallon of milk but it gets
> heavy.
> Q But you wouldn't want to lift it over your head.
> A No, I would not.
> Q With your right arm.
> A Nope, I would not.
> *Q But with your left arm, you would.*
> *A My left arm, I could.*
> *Q How much weight can you lift and carry with your left arm?*
> *A I'm going to guess maybe 20 pounds.*
> *Q Okay. So if you had a job where you didn't need to lift more than*
> *20 pounds and never more than 10 with your right upper extremity*
> *and you didn't have to do any work above shoulder height, you might*
> *be able to do that.*
> *A. I might be able to. With things that I do around the house, I don't*
> *think I can do it for long periods of time.* I—
> Q Okay. Tell me about . . . . not being able to do things for long
> periods of time around the house.
> A Okay. If I wash laundry and I go to hang out on the clothesline,
> when I am done, my shoulder hurts really bad and it swells up. So,
> you know, a half hour, 45 minutes of hanging stuff out and taking it
> back down and putting it away is aggravating it.
> Q That's really pretty strenuous work, you're lifting the clothes up
> and onto a clothesline, pin them up there with clothespins.

15

> A Right.
> *Q So you're working [over] your head.*
> *A A little bit. My line's lowered.*
> Q But it's sort of doing the [INAUDIBLE], right? Over your head for
> 45 minutes.
> A I can do the left-hand hanging pretty good. I don't use my left hand
> very much but I have been since the surgery.

(Tr. 56-58 (emphases added); *see also* Pl.'s Mot. Summ. J. at 9 (citing Tr. 56-57).)

Before turning to whether the ALJ reasonably discounted this testimony, it is worth noting that this testimony is arguably not even in tension with the ALJ's hypothetical to the vocational expert. The ALJ asked the vocational expert to consider someone who could lift 20 pounds up to one-third of the workday and 10 pounds up to two-thirds of the workday. (Tr. 63.) As quoted above, Dygert testified that, by using her left arm, she could lift and carry 20 pounds and even lift a gallon of milk, approximately eight-and-a-half pounds, above her head. (*See* Tr. 56-57.) As for right-arm limitations, the ALJ provided that the hypothetical individual could never lift, push, or pull more than 10 pounds, needed to avoid working above shoulder height, and needed to avoid reaching. (Tr. 63.) As quoted above, when the ALJ asked Dygert about working with these very demands, she conceded that she "might be able" to perform them. (Tr. 57.) It is true that Dygert qualified her statement with "I don't think I can do it for long periods of time," but the example she provided to the ALJ was arguably beyond the limitations the ALJ asked about. (Tr. 57.) In particular, it appears that at least some of the 30 to 45 minutes of clothes hanging involved overhead work. (*See* Tr. 58.) Thus, Dygert's testimony about her right-arm limitations was arguably consistent with the functional limitations the ALJ included in the hypothetical to the vocational expert.

And to the extent that Dygert testified to having less right-shoulder functioning than the hypothetical individual, the ALJ reasonably discounted Dygert's claims. As the ALJ explicitly noted

in his narrative, Dygert testified that her shoulder condition had not changed since her last evaluation in October 2010. (*See* Tr. 23.) At that appointment, Dygert reported that her right-shoulder pain was only one or two on a ten-point scale. (Tr. 393.) Further, "General strength testing show[ed] 5/5 strength without pain with internal rotation; external, supraspinatus and biceps tension all with 4+/5 strength without pain." (*Id.*) Thompson also declined to provide any functional assessment of Dygert at that last exam, noting that he and Dr. Pinto needed an "objective assessment on the patient's limitations" that could be provided by a functional capacity examination. (Tr. 393.) And even Thompson and Dr. Pinto's prior limitations only prohibited Dygert from lifting, pushing, or pulling greater than five to ten pounds and from engaging in overhead activities. (*E.g.*, Tr. 396.) These limitations are entirely consistent with the limitations the ALJ included in the hypothetical to the vocational expert: "never [lifting] more than 10 pounds with the right dominant upper extremity;" "never [pushing or pulling] more [than] 10 with the right dominant upper extremity," and "avoid[ing] above shoulder height or reaching with the right upper extremity." (Tr. 63.) In short, Thompson and Dr. Pinto's records are substantial evidence supporting the ALJ's decision not to credit Dygert's allegations about her right-shoulder functioning to the extent those allegations are beyond the functional limitations included in the hypothetical to the vocational expert.

Dygert next cites her testimony about shoulder soreness, needing breaks, and needing to nap. (Pl.'s Mot. Summ. J. at 9.) Regarding needing to take breaks, Dygert testified,

> [ALJ:] And I see in the record here that you also cut squares out and make–you do quilting. Is that right?
> [DYGERT:] Yes, I do.
> Q Okay and you're still able to do that okay.
> A Yup, I can do a lot of like things just for certain amount of time and I have to take a break.
>
> * * *

[DYGERT'S COUNSEL:] Okay and when you say that you take breaks when you are doing things during the day, what are you doing? Are you just walking around, pacing, sitting down or what are you doing?

[DYGERT:] I have a couch . . . that reclines back into a recliner, so I'll sit back. I can put ice packs on my shoulder.

Q Okay and when you sit back, where are your feet at?

A Mid—like two feet off the ground. They're up. They're elevated.

(Tr. 61.) And Dygert testified about her napping as follows:

[DYGERT:] I do not sleep good. I wake up a lot.

[DYGERT'S COUNSEL:] Why?

A I can't get comfortable on the pillows. I have to have a lot of pillows propped up and my shoulder hurts.

\* \* \*

[DYGERT'S COUNSEL:] Okay and how do you feel during the day, like energy wise?

[DYGERT:] You mean aside [from] depression?

Q Well, no; just like, how is your energy? Do you have a lot of get up and go? I mean, how do you feel?

A I have to say I worry about what I'm going to end up doing for the day. It's not 100 percent, let's go get it done.

Q Okay. Do you take any naps during the day?

A I do take a nap in the afternoon. Sometimes, I try to not do it but I give in and it's about 2:00, I feel sleepy or sore and I just need to lay down for a while.

Q And how long do you nap or lay down for?

A It can be anywhere from 20 minutes to an hour and a half.

Q And do you know why you feel fatigued?

A Probably overdoing it.

Q Okay.

A Not sure.

(Tr. 61-62.)

As with her testimony about her right-shoulder lifting and reaching ability, Dygert's statements about needing to break or nap are not necessarily inconsistent with the limitations the ALJ provided to the vocational expert. The above statements leave open the possibility that Dygert

18

did not need to take significant breaks when performing activities *within* the functional limitations set forth in the ALJ's hypothetical. In other words, even if the ALJ had fully credited Dygert's testimony that she could do "a lot of like things" but for only a "certain amount of time," this would not require a finding that Dygert needed unscheduled breaks if performing the particular jobs the vocational expert identified. Similarly, Dygert stated that she was "unsure" as to what caused her to feel tired and nap and vaguely referenced "overdoing it." Further, Dygert's testimony about needing breaks, lying down, or napping has little corroboration in the record. Upon a review of the treatment notes following her second surgery, Dygert did not report fatigue. (*See* Tr. 326-30, 393-98.) It is true that, at one visit, Dygert reported that she was continuing to have pain that "occasionally [woke] her up at night." (Tr. 397.) This statement, however, did not require the ALJ to find that Dygert's sleep was so poor that she needed to nap. As for taking breaks, when Thompson and Dr. Pinto limited Dygert's right-shoulder use, they did so by weight and range of motion restrictions, not by time or frequency-of-use restrictions. In short, the ALJ's conclusion that Dygert was "credible to the extent that her testimony [was] supported by and consistent with the medial evidence of record" (Tr. 23) was reasonable insofar as it applied to Dygert's testimony about needing breaks, lying down, and napping.

Finally, Dygert implies that the ALJ erred by discounting her testimony based on her lack of treatment without giving adequate consideration to her ability to afford treatment. (Pl.'s Mot. Summ. J. at 10-11.) But a review of the ALJ's narrative suggests that he did not discredit Dygert's testimony because of the amount of treatment Dygert received. (*See generally*, Tr. 23.) Although the ALJ acknowledged that Dygert lacked insurance, it appears that he primarily discounted Dygert's testimony because of her considerable daily activities and because she had continued to

have limited pain since her last treatment in October 2010. (*See* Tr. 23.)[1]

## IV. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that Dygert has not shown that the ALJ's decision to discount her testimony lacked substantial evidentiary support. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 10) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## V. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

---

[1]The Court notes that, upon reviewing the record in this case, it appears that the ALJ did not obtain an expert opinion on medical equivalence for Dygert's physical limitations. (*See* Tr. 68-82 (single decision maker's report indicating that single decision maker, rather than medical professional, opined on physical capacity); Tr. 83 ("Disability Determination and Transmittal" form signed by Leonard Balunas, Ph.D. whose specialty code indicates that he is a psychologist); Tr. 380-82 (physical consultative examiner did not opine on equivalence).) Cases from this District have remanded where an ALJ fails to obtain a medical expert's opinion on equivalence. *E.g.*, *Brown v. Comm'r of Soc. Sec.*, No. 12-14506, 2013 WL 6537980 (E.D. Mich. Nov. 18, 2013), *report and recommendation adopted*, 2013 WL 6538136 (E.D. Mich. Dec. 13, 2013). In this case, however, given that Dygert says nothing about this error and has instead chosen to focus on the ALJ's credibility assessment, and given that the district judge assigned this case has already opined on the propriety of raising the equivalency issue *sua sponte* in that type of situation, the Court will not address this error further. *See Thames v. Astrue*, No. 11-15294, 2013 WL 1279058, at *2 (E.D. Mich. Mar. 26, 2013) ("Plaintiff, however, has made no arguments or put forth any evidence from which to conclude that her impairments met or equaled one of the listings in the regulations. It was Plaintiff's burden to make this showing. *See Lusk v. Comm'r Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). In this respect, her case is distinguishable from other cases where a remand was found to be necessary due to the ALJ's failure to consult an expert on the equivalency determination.").

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: January 3, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 3, 2014.

s/Jane Johnson
Deputy Clerk

21